### KUEBLER v. KUEBLER.
#### No. 59 C 1207.

Circuit Court, Palm Beach County.

March 2, 1960.

Wardlaw, Stewart & Van der Hulse, West Palm Beach, for the plaintiff.

E. M. Baynes, Phillips & Hathaway, West Palm Beach, for the defendant.

JOSEPH S. WHITE, Circuit Judge.

This cause was heard upon the executor's motion filed August 18, 1958 for summary judgment, the petitioner's motion filed September 3, 1958 for summary judgment, the executor's motions filed September 23, 1958 to dismiss, to strike, and for jury trial, the executor's demand for jury trial and motion filed September 14, 1959 to dismiss, the executor's motion filed December 4, 1959 for leave to file additional defenses, and argument of counsel.

The court is called upon in this proceeding to determine the right to the possession of 796 shares of the corporate stock of the City Loan and Savings Company, Lima, Ohio, as between the claimant, Clyde Kuebler, on the one hand, and Rudolph H. Kuebler, as executor of the last will and testament of Louis Kuebler, deceased, on the other. The stock certificate is dated February 15, 1955, and was issued to —"Louis Kuebler and Clyde Kuebler as joint tenants with right of survivorship and not as tenants in common". Louis Kuebler died during the month of September 1956, a resident of Palm Beach County, and the stock certificate came into the hands of the executor as hereafter explained.

During his lifetime Louis Kuebler owned in his sole name 2125 shares of the capital stock of the City Loan and Savings Company, Lima, Ohio. The stock was represented by several different stock certificates, and from time to time Louis hypothecated all of them

to First National Bank, Lake Worth, Florida. Lake Worth Bank had actual, physical, possession of the certificates. On February 15th, 1955, Louis caused 796 shares to be re-issued to Louis and Clyde jointly, as previously stated. Clyde was the nephew of Louis. Apparently, Clyde had no knowledge of the transfer until June 22, 1955, when Lake Worth Bank wrote Clyde as follows —

"Your uncle, Mr. Louis Kuebler, has instructed this bank to transfer certain shares of stock in the City Loan and Savings of Wapakoneta, Ohio, into the joint ownership of yourself and Mr. Kuebler.

"The above stock is pledged for certain loans at this bank. It will be necessary for you to sign the enclosed stock assignments and return so this transaction may be completed.

"A self addressed envelope is enclosed for your convenience. If we may be of any further assistance please do not hesitate to call on us."

Clyde signed the stock assignment in blank and returned it to the bank.

On July 12, 1955, Louis caused the further number of 1329 shares to be re-issued to Louis and Clyde jointly, in the same fashion as the other 796 shares. All of the stock remained in the possession of Lake Worth Bank as security for loans to Louis, and Lake Worth Bank continued to hold Clyde's bank stock assignment.

During October, 1955, Louis caused Lake Worth Bank to forward the stock certificates for 1329 shares to the savings company with the request that new certificates be issued to "Louis Kuebler and Rudolph Kuebler, as joint tenants with the right of survivorship and not as tenants in common". This was done and the certificates returned to Lake Worth Bank. From aught appearing in the record Clyde was never notified of the transfer. Apparently, the savings bank acted solely upon the strength of the stock assignments signed in blank by Clyde. He has never questioned or protested the making of the transfer.

Under date of January 5, 1956, Louis wrote Clyde —

"Sign your name under my. I just got some dividend stock from the City Loan. So I want to get your name on it. Return it as soon as you can. I am feeling better getting along although today we are having cold weather — down to 40°. See you next summer."

Apparently, a stock assignment was enclosed. Clyde signed it without hesitation or objection and returned it to Louis.

On February 6, 1956, Louis again wrote Clyde —

"Please sign this stock paper on the back in the presence of some one as wittness. When I get it back I will sign it. This is my dividend stock and they made an error. I have 796 shares on your name. It reads like this. In 2 weeks I will send you a card for you to sign a Joint Stockholders Contract."

This "stock paper" likewise was signed by Clyde without objection and returned to Louis.

At one time Louis executed a will, later revoked, wherein Clyde, along with Rudolph, was named residuary beneficiary of Louis' estate. Rudolph was Louis' son. After the transfer of the 1329 shares of stock to Clyde in July, 1955, Louis executed a new will revoking all former wills and making no mention of Clyde. Louis' last will and testament subsequently probated, was executed in August, 1956, and likewise made no mention of Clyde. Upon Louis' death, Rudolph qualified as executor of the will, and Lake Worth Bank called upon the executor to pay Louis' debt. This was done and all of the stock certificates, along with Clyde's blank stock assignment, were delivered to the executor. Clyde now claims the 796 shares of stock.

The record does not disclose how many stock assignments Clyde executed in blank, but at least one remained in the hands of Lake Worth Bank at the time of Louis' death.

Unquestionably, Louis intended that Clyde should have the 796 shares of stock upon the former's death, but requirements for its testamentary disposition were not met. Unless an interest vested in him during the donor's lifetime, Clyde cannot prevail here.

It is well settled that to effectively pass title by gift there must be a surrender of dominion over the res, coupled with the intent then and there to pass title. In other words, there must be an immediate vesting of some interest in the donee, complete and irrevocable. If the donor withholds divestiture it is not a legal gift. A delivery which does not confer the present right to reduce the res into possession of the donee is insufficient. Thus, no gift is consummated where there is delivery to a third person, if it is clear that the third person is holding the property on behalf of the donor, who has no intention of divesting himself of control. If the intention of the donor is that nothing is to vest until his death, the transaction is testamentary in character and will fall unless it conforms with the formal requirements of the law relating to testamentary disposition of property. Leonard v. Campbell, 138 Fla. 405, 189

So. 839; Webster v. St. Petersburg, etc., 155 Fla. 412, 20 So. 2d 400; Dodson v. National, etc., 159 Fla. 371, 31 So. 2d 402; Crossman v. Naphtali, 160 Fla. 148, 33 So. 2d 726; Barbash. v. Barbash (Fla. 1952), 58 So. 2d 168; Conova v. Florida Bank, etc. (Fla. 1952), 60 So. 2d 627; In re Engler's Estate, 3 Fla. Supp. 4, app. dism'd no opinion 66 So. 2d 305; Eulette v. Merrill (Fla. 1958), 101 So. 2d 603; Coffey v. Commissioner (CCA5 1944), 141 Fed. 2d 204.

Proof to establish a gift after the death of the donor must be clear and convincing, the presumption in such case being against the party alleging it. But intention alone, no matter how well established, gives rise to no obligation which the law will enforce. The intention must be executed by a *complete* and *unconditional* delivery. Garner v. Bemis, 81 Fla. 60, 87 So. 426; Stigletts v. McDonald, 135 Fla. 385, 186 So. 233; In re Slawson's Estate (Fla. 1949), 41 So. 2d 324.

It is apparent from the circumstances shown by the record that Clyde signed and delivered the stock assignment in blank to Lake Worth Bank for the purpose of giving Louis complete control over the stock. This is demonstrated by the fact that in October, 1955, without notifying Clyde, Louis took 1329 shares, previously transferred to Clyde, and changed ownership to Rudolph. Likewise, Louis could have changed ownership of the remaining 796 shares now in dispute. This meant that Louis had complete control of the stock. Clyde fully understood that to be the effect of the transaction as appears from statements made by Clyde in answer to questions propounded to him upon a discovery deposition taken at the instance of the executor. Clyde stated that it was his understanding that Louis was to "keep it [the stock] until after his [Louis'] death" (p. 18); that Clyde would "get the stock after the death of Louis Kuebler" (p. 67). Furthermore, he made no protest or objection to the procedure followed.

This makes it clear that the essentials of a gift were not present. It is also well established that an imperfect gift inter vivos cannot be enforced as a trust. Anno. 123 A.L.R. 1335.

It follows that no interest in the stock vested in Clyde during the lifetime of Louis and Clyde's claim cannot be allowed.

For many cases on the subject see Anno. 23 A.L.R. 2d 1171. Compare also, Reid v. Cromwell (Me. 1936), 183 Atl. 758; Manning v. National Bank (Ore. 1944), 148 Pac. 2d 255, 153 A.L.R. 922; Southern, etc. v. Marsh (CCA5 1926), 15 Fed. 2d 347; In re Grossman's Estate (Penn. 1956), 126 Atl. 2d 468.

It is accordingly ordered and decreed that the executor's motion for summary decree is granted. The petitioner's motion for summary decree is denied. The petition of Clyde Kuebler for possession of the stock certificate, etc., is denied, with costs taxed against the petitioner.